IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

EMANUEL CLARK,

        Petitioner,

v.                                   CIVIL ACTION NO. 5:11cv105
                                          (Judge Stamp)

KUMA DEBOO, Warden,

        Respondent.

## REPORT AND RECOMMENDATION

### I. BACKGROUND

On July 28, 2011, the *pro se* petitioner, Emanuel Clark, an inmate at FCI Gilmer, in Glenville, West Virginia, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. Along with his petition, Clark filed a motion to proceed *in forma pauperis* ("IFP"). On August 15, 2011, he paid the $5.00 filing fee. Accordingly, on October 3, 2011, an Order was entered, denying his IFP motion as moot.

In his petition, the petitioner challenges a decision of the United States Parole Commission (USPC). The undersigned conducted a preliminary review on October 4, 2011, and determined that summary dismissal was not appropriate at that time. Accordingly, a show cause order was entered. On November 1, 2011, the respondent filed a Motion to Dismiss, or in the alternative, Motion for Summary Judgment. On November 7, 2011, a Roseboro[1] Notice was issued. As of the date of this report and recommendation, the petitioner has not filed a response.

This matter, before the undersigned for a Report and Recommendation pursuant to LR PL P 2, *et seq.*, is ripe for review.

---
[1] Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975).

## II. **FACTS**

On October 27, 1995, petitioner, then 22 years old and out on bond from a November 27, 1994 conviction for carrying a pistol without a license, committed an assault with intent to commit robbery while armed.[2] After being convicted on all counts, on March 13, 1996, the Superior Court for the District of Columbia sentenced the petitioner to an aggregate sentence of 40 years for the armed assault with intent to commit robbery in violation of DCC §§ 22-501, -3202; possession of a firearm during a crime of violence in violation of DCC §§ 22-3204(B); carrying a pistol without a license in violation of DCC §§ 22-3204(A); and possession of an unregistered firearm and ammunition, in violation of DCC §§ 6-2376. (Dkt.# 13-4 at 2). The petitioner became eligible for parole on December 11, 2008. (Dkt.# 13-4 at 3).

On May 7, 2008, a hearing examiner for the U.S. Parole Commission conducted petitioner's first parole hearing. At the time of the hearing, petitioner was 35 years old and had served 152 months of his sentence. (Dkt.# 13-3 at 4). He had a Salient Factor Score ("SFS") of 5, a Base Point Score of 5, and a Total Guideline Range of 214. (Dkt.# 13-5 at 2-3). In her hearing summary, the hearing examiner noted that since being incarcerated, petitioner had incurred four BOP Incident Reports for various institutional rules violations, which she then covered at the hearing. Three of the violations were rated as non-drug related infractions with Rescission Guidelines of 0-2 months each. The fourth was rated as new criminal conduct with a Category 5 severity, for assault on an inmate causing bodily injury, with a Rescission Guideline of 36-48 months, giving him a Disciplinary Guideline of 36-54 months, to be added to his base

---

[2] Clark was also charged with, and pursuant to a jury trial, convicted of possession of firearm during crime of violence; carrying a pistol without a license; possession of an unregistered firearm; and unlawful possession of ammunition. (Dkt.# 14-1 at 1).

point score guideline range. (Dkt.# 13-3 at 4).³ On May 25, 2008, the hearing examiner issued her overall evaluation and recommendation which indicated that petitioner had 160 months to serve before he reached his parole eligibility date. Assigning a total guideline range of 214-239 months, she recommended that he be denied parole and receive a three year set off. (Id.).

On June 17, 2008, the Commission issued its decision. Adopting the recommendations of the hearing examiner, the Commission denied parole and continued petitioner to a Three Year Reconsideration hearing in May, 2011, after the service of thirty-six months from his hearing date of May 7, 2008. (Dkt.# 13-5 at 1).

On December 22, 2009, petitioner came up for another parole hearing. Petitioner appeared at that hearing with counsel. At the time of the hearing, petitioner was 37 years old and had served 170 months of his sentence. (Dkt.# 13-7 at 3). The hearing examiner for the Commission determined that fewer than twelve months had passed since petitioner's parole eligibility date of January 5, 2009, petitioner's hearing should be conducted as a new Initial

---

³ Petitioner's first violation, a Class I offense, possession of intoxicants, occurred on July 16, 2002, when he was found with 8 gallons of homemade wine in the secured locker in his cell. In response to the hearing examiner's inquiry, the petitioner admitted the violation, explaining that he was making wine to sell to other inmates to earn extra money, stating "you have to do certain things to survive in prison." (Dkt.# 13-3 at 3 and 13-7 at 2 and 4).
  The second, also a Class I offense, was an April 13, 2003 assault with serious injury, which occurred when petitioner pulled another inmate down from a top bunk and kicked him in the ribs. The victim sustained bruised ribs and his jaw was broken in two places, requiring it to be wired together to stabilize it. Petitioner admitted this incident to the hearing examiner as well, saying it was "penitentiary stuff" that "is what it is." He reported that he shared the cell with the victim in the incident, and his "celli," the third resident of that cell, initially started the fight with the victim, and he then joined in to assist his "homey" in beating the victim. He expressed no remorse or concern for the injuries he inflicted. (Id.).
  The third and fourth violations, both Class II offenses, occurred on September 18, 2006, when petitioner was charged with fighting and refusing to take an alcohol test. Upon inquiry by the hearing examiner, petitioner admitted to refusing to take the alcohol test, saying he had taken it once and when the C.O. kept asking him to blow again, he refused. He denied the fighting charge, however, claiming it was a "bogus" charge for which the institution had "framed him." His version of the incident was that he and his celli were drinking in their cell, wrestling and engaging in horse play, when his celli hit his head against the bed frame, sustaining a cut above his nose which bled profusely, causing him to panic and to push the button. As a result, both were taken to the Special Housing Unit ("SHU") and his celli was treated in the Medical Unit. He contended that although both he and his celli denied fighting, they were both charged with it anyway. (Dkt.# 13-3 at 2 and 13-7 at 2 and 4).

Hearing. The examiner discussed the details of the offense of conviction with petitioner, who admitted his role but denied that the robbery was an attempt to take the victim's jacket, claiming he was only after the victim's money. He admitted firing a shot intentionally to scare the victim. He indicated that he was sorry he committed the crime, but stated that he was only 21 and was heavily involved in the drug and street lifestyle himself when he did it; was snorting cocaine and smoking weed when he committed the offense; and that he only robbed drug dealers, never "any ordinary citizens." He denied ever having any past commitments. He stated that he had lost his 20s and most of his 30s since being incarcerated, and had lost seven family members within a 15 month period. (Dkt.# 13-7 at 2). Although he simultaneously denied having any serious disciplinary infractions since being incarcerated, he asked that the Commission not look at his disciplinary conduct involving possession of a knife. He insisted he had learned his lesson, was not a threat to the community, and that he had a very supportive family who would help him when he was released.

Because the petitioner had earned various certificates of completion,[4] was working on his GED with satisfactory progress, and holding a job in the Education Department with consistently good work evaluations, the examiner recommended a one-point reduction in his Grid Score for sustained program achievement. However, the hearing examiner noted that since his Initial Hearing, petitioner had incurred two more Class I violations, Possessing a Dangerous Weapon on March 26, 2009, and Possessing Intoxicants (being intoxicated) on September 27, 2008,

---

[4] Petitioner had completed a drug program in 2004, Literacy and Alcoholics Anonymous/Narcotics Anonymous, and had earned 19 hours in 2005, taking classes in Spanish, Keyboarding, Strategic Future, two fitness classes, and Anger Management. (Dkt.# 13-7 at 3).

categorized as serious and negative institutional behavior,[5] warranting the addition of a point, for a final Grid Score of 3. He noted that the 1991 policy guidelines permitted a departure on the basis of serious negative institutional behavior, warranting a decision above the 1987 DC Board of Parole Guidelines. On January 15, 2010, the hearing examiner issued summary report, recommending that the petitioner be denied parole and continued for a Rehearing in December, 2012, after the service of an additional thirty-six months from his hearing date of December 22, 2009. (Dkt.# 13-7 at 4).

On February 13, 2010, the Commission issued its decision. Adopting in part the recommendations of the hearing examiner, the Commission denied parole but continued petitioner for a Reconsideration hearing in December 2011, after the service of twenty-four months from his hearing date of December 22, 2009. (Dkt.# 13-6 at 1).

Petitioner's next reconsideration hearing was scheduled for the week of November 14, 2011. (Dkt.# 13-9 at 1).[6] As of December 28, 2009, the petitioner was 37 years old and had been in confinement for a total of 170 months. (Dkt.# 13-7 at 3).

The full term expiration date of petitioner's aggregate 40-year sentence is September 6, 2035. (Dkt.# 13-4 at 3).[7]

## II. CONTENTIONS OF THE PARTIES

---

[5] The examiner commented that unlike in many other cases he had seen, where prisoners who came into the institution immediately got involved in serious disciplinary infractions but later tended to mellow out, petitioner's serious infractions did not commence until after he had been in custody for over eight years. The examiner concluded that based on petitioner's testimony about "being stuck in prison" and having done enough time, petitioner was more remorseful for the hardships his conviction and sentence had cost him, rather than any genuine remorse for the victim of his crime. (Dkt.# 13-7 at 3-4).

[6] The outcome of the most recent parole hearing is not before the undersigned at this time.

[7] At the time he was sentenced, petitioner was entitled to 195 days of total jail credit time. (Dkt.# 13-4 at 3).

5

The petitioner's claims, reordered here for expediency, are that the United States Parole Commission ("USPC" or the "Commission") violated his due process rights by its:

1) exercise of the 1987 Parole Guidelines;

2) calculation of his parole with a Reconsideration Hearing in violation of the "DCMR specific remedial police [sic] §104.2;"

3) use of his institutional infractions outside the window of the DCMR Parole Guidelines; and

4) the USPC's "exercise of risk evaluation under the 2000 the 1987 [sic] DC Parole Guidelines violates the Ex Post Facto clause."

As relief, he requests that the Court to authorize the U.S.P.C. to release him with "high supervision on parole."

The respondent argues that the petitioner has failed to state an *ex post facto* claim; his due process claims lack merit; and 28 DCMR §104.2 does not require reconsideration of parole in every year in all circumstances, nor does due process.

### III. STANDARD OF REVIEW

**A. Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); see also Martin, 980 F.2d at 952.

6

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Conley, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citations omitted), to one that is "plausible on its face," id. at 570, rather than merely "conceivable." Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir.2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir.2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

**B. <u>Summary Judgment</u>**

The Supreme Court has recognized the appropriateness of Rule 56 summary judgment motions in habeas cases. See Blackledge v. Allison, 431 U.S. 63, 80 91977). So too, has the Fourth Circuit Court of Appeals. Maynard v. Dixon, 943 F.2d 407 (4th Cir. 1991). Pursuant to Rule 56c of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Motions for summary judgment impose a difficult standard on the moving party; for it must be obvious that no rational trier of fact could find for the nonmoving party. Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). However, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242-252 (1986). To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, 477 U.S. at 248. It is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 587-88 1986).

## IV. DISCUSSION

At one time, there existed a "Board of Parole....for the penal and correctional institutions of the District of Columbia," D.C. Code § 24-401.01(a) (2001), which determined an offender's

suitability for parole. In 1997, Congress overhauled the District of Columbia's government, including the parole system through the National Capital Revitalization and Self-Government Improvement Act of 1997, Pub. L. No. 105-33, §11231(a)(1), 111 Stat. 712, 745, D.C. Code §24-1231(a)("Revitalization Act."). The Revitalization Act abolished the D.C. Board of Parole, and the USPC obtained jurisdiction of D.C. Code offenders to grant and deny parole. Accordingly, since August 5, 1998, the USPC has conducted the hearings and decided the requests for parole of all persons convicted of violating the D.C. Code.[1] Prior to that date, the D.C. Parole Board conducted the parole hearings for D.C. Code offenders, applying guidelines it formally adopted in 1985, and published in the District of Columbia Municipal Regulations in 1987 ("1987 Regulations"). Upon assuming the D.C. Board's jurisdiction, the USPC began a process of revising the regulations for determining D.C. Code offenders' suitability for parole. See Sellmon, 551 F.Supp.2d at 72-73 (discussing revisions). The revisions were codified at 28 C.F.R. §§ 2.70-2.107 in 2000 ("2000 Regulations"). The 2000 Regulations specify that they are applicable to a D.C. Code offender, whose first parole hearing would occur after August 5, 1998. See 28 C.F.R. § 2.80(a)(5).

**A. 1987 Regulations**

"The 1987 Regulations were adopted to 'structure the exercise of the paroling authority's discretion' and to promote 'increased consistency in parole release decisions and enhanced accountability of the Board' by making '**explicit** those factors that will be considered in each case." Sellmon at 554, *quoting* Report on the Development of the Paroling Policy Guidelines for the District of Columbia Board of Parole (emphasis in original). Under the 1987 Regulations,

---

[1] Effective August 5, 2000, the USPC also was given the responsibility of supervising parolees and revoking parole. §11231(a)(2) of the Act codified at D.C. Code §24-131(a)(2).

after serving his minimum sentence, a D.C. Code offender became eligible for parole.[2] The D.C. Parole Board would then determine the prisoner's suitability for parole by calculating a total point score (TPS) which ranges from 1 to 5. Based on the TPS score, the 1987 regulations lead to one of two outcomes: "parole shall be granted" or "parole shall be denied." D.C. Mun. Regs. Tit. 28, §§ 204.19-.22 (1987) (repealed 2000). At an initial parole hearing, a prisoner with 0, 1, or 2 points "shall be" granted parole with varying degrees of supervision. Id. at § 204.19. For a prisoner with 3, 4, or 5 points, "[p]arole shall be denied at initial hearing and hearing rescheduled." Id. However, regardless of whether the 1987 Regulations indicated that a prisoner's parole should be granted or denied, the D.C. Board retained the discretion to reach a different decision if merited by "unusual circumstances." Id. at § 204.22.

**B. The 2000 Regulations**

Between 1998 and 2000, the Commission drafted new parole regulations and guidelines that it applied to any offender who received an initial parole hearing after August 5, 1998. See Sellmon 551 F.Supp.2d at 73. The Commission justified its revisions by explaining that its research demonstrated that "[t]he point score system used by the D.C. Board of Parole ha[d] resulted in a high rate of upward departures from the guidelines based upon factors that should be included in the guidelines...." 63 Fed.Reg. 17771, 17772 (Apr. 10, 1998).

The 2000 Regulations establish the process the Commission follows to calculate the number of months a prisoner should serve in custody before he is suitable for parole. This multi-step process results in what is called the Total Guidelines Range, which is the "amount of time [a

---

[2]"[T]he justice or judge of the court imposing [a felony] sentence shall sentence the person for a maximum period not exceeding the maximum fixed by law, and for a minimum period not exceeding one-third of the maximum sentence imposed, and any person so convicted and sentenced may be released on parole...at any time after having served the minimum sentence. " D.C. Code § 24-403 (2001).

prisoner] may expect to serve with continued good conduct and ordinary program achievement." 65 Fed. Reg. 0663, 70664 (November 27, 2000). Until the prisoner has served a period of time equal to the bottom of his total guideline range, he is presumed to be unsuitable for parole. See 28 C.F.R. §§ 2.80(h), (I), & (f). Like the 1987 Regulations, the 2000 Regulations permit the USPC to deny parole to a prisoner who is presumptively eligible under "unusual circumstances." The 2000 Regulations provide examples of "unusual circumstances" but do not limit the discretion of the USPC to depart on any basis that it classified as "unusual" except that it cannot have been "fully taken into account in the guidelines." 28 C.F.R. § 2.80(n).

## V. ANALYSIS

The undersigned prefaces his analysis by declaring that petitioner's claims are, in places, inarticulate and so unclearly stated they are difficult to sort. Petitioner frequently omits key words and at times, makes claims that are inapt and internally contradictory.[8] Nevertheless, the undersigned has examined his claims and determined that they lack merit.

**Grounds One, Two and Three**

As previously noted, the petitioner raises three due process claims, alleging in Ground One that the U.S.P.C. violated his rights by its "exercise of the 1987 Parole Guidelines;"[9] in Ground Two, that at his December 22, 2009 Reconsideration Hearing, it incorrectly calculated his parole in violation of 28 DCMR §104.2; and in Ground Three, used institutional infractions that fell outside the window of the DCMR Parole Guidelines in order to deny him parole.

---

[8] As examples, petitioner not only quotes Red Riding Hood's grandmother and Humpty Dumpty, but several times complains that the U.S.P.C. "retarded" his May 2008 parole hearing.

[9] However, on the last page of his memorandum, petitioner declares emphatically that "[t]he 1987 Parole D.C. [sic] Guidelines control and it is these guidelines that must be applied to this case." (Dkt.# 1-1 at 7).

A thorough review of petitioner's attached memorandum reveals that what petitioner may be actually be attempting to argue is that the 1987 guidelines that were re-implemented to incorporate the <u>Sellmon</u> criteria ended up "costing him" not only a denial of parole at his initial May 7, 2008 parole hearing, but also "cost him" the crediting to his December 2009 hearing "set-off" of nineteen months of time served between the two parole hearings .

The <u>Sellmon</u> criteria for awarding a remedial Initial Parole Hearing were eventually codified at 28 CFR 2.80 - Guidelines for D.C. Code offenders. They specified that when a new parole hearing is awarded in the case of a prisoner eligible for the application of the 1987 guidelines

> (4) At the hearing, the hearing examiner shall evaluate the prisoner's case using the 1987 Board guidelines, as if the prisoner were receiving an initial hearing. If appropriate, the hearing examiner shall evaluate the case using the 1987 Board guidelines for rehearings, revising the initial point score based on the prisoner's prison conduct record and program performance. The Commission shall use the former Board's policy guidelines in making its determinations under this paragraph, according to the policy guideline in effect at the time of the prisoner's offense.
> **(5)** If the Commission denies parole after the hearing, and the prisoner received a presumptive parole date under the parole determination that preceded the hearing under this paragraph, the prisoner shall not forfeit the presumptive parole date unless the presumptive date is rescinded for institutional misconduct, new criminal conduct, or for new adverse information.
> **(6)** Decisions resulting from hearings under this paragraph may not be appealed to the Commission.

28 CFR 2.80(o)(4)-(5)(2009).

In this case, it is clear that the crimes for which petitioner is incarcerated were all committed prior to the adoption of the 2000 Regulations. It is equally clear that the USPC utilized the 2000 regulations in May 2008 when it first denied petitioner parole. However, when applied to petitioner's circumstances in May, 2008, the 1987 regulations would not have

indicated that parole "shall be granted." Petitioner's Total Guideline Range was 214-238, nowhere within the range for release on parole. Even if he could establish an *ex post facto* violation, he was not entitled to an order granting him release on parole. At best, he would be entitled to a new parole hearing, with instructions to the USPC to apply the 1987 regulations. However, it is clear that he has already received this precise relief.

A careful review of the petitioner's December 2009 hearing summary establishes that it was conducted pursuant to the 1987 Regulations. The Board's consideration of his applicable factors resulted in a TPS of 3, and indicated parole should be denied.[10] D. C. Mun. Regs. Tit. 28, § 204.19. Additionally, a departure from guidelines was found warranted on the basis of petitioner's pattern of serious and negative institutional behavior. Accordingly, petitioner cannot show that under either scenario, he would have been eligible for parole on either date.

Petitioner's Ground Two claim is that the Commission's December 22, 2009 Reconsideration Hearing calculation violates "DCMR §104.2." Inexplicably, petitioner contends that at his December 2009, the hearing examiner Kubic

> determined that Petitioner had no negative institutional behavior within the three (3) years proceeding [sic] his December 2009, [sic] hearing. Notwithstanding[] this assessment, but Examiner Kubic concluded that a departure was warranted from the guideline and recommended that Petitioner receive a three (3) year set-off.

(Dkt.# 1-1 at 2-3).

Setting aside for the moment the fact that hearing examiner Kubic came to the opposite conclusion as to petitioner's negative institutional behavior since his previous hearing on May 7,

---

[10] Of note, had petitioner not incurred two Class I violations in the previous nineteen months since his prior hearing, his TPS score would not have had the additional point added to it, and his TPS score would have been 2, within the range for parole "shall be" granted. D.C. Mun. Regs. Tit. 28, § 204.19.

2008,[11] (28 DCMR) §104.2 states "[o]ffenders serving a maximum sentence of more than five (5) years shall *ordinarily* receive rehearings within twelve (12) months. 28 DCMR § 104.2 (1987)." (emphasis added). However, as the respondent correctly noted, petitioner's case is not ordinary, as the Commission's February 13, 2010 detailed Notice of Action explained.[12] The Commission's decision to postpone petitioner's reconsideration hearing for an additional year was well within its discretion under the circumstances. As the United States Supreme Court held in Garner v. Jones, 529 U.S. 244, 254-55 (2000), there is no facial *ex post facto* violation in a policy giving state parole boards the discretion to postpone parole reconsideration. A full review of the record reveals that petitioner's negative institutional behavior commenced in July, 2002, almost six and a half years after he was sentenced in March 1996. From 2002 until approximately nine months before his December 2009 parole hearing, he committed three Class I and four Class II violations, ranging from assault with serious injury, possession of a knife,

---

[11] This is not the only misrepresentation petitioner has made within this record. At the December 2009 hearing, he told the hearing examiner that he had had no commitments prior to this incarceration, when in fact, the record reveals that he had one prior commitment. (Dkt.# 13-8 at 1).

[12] "The Commission has determined that a decision outside the guideline to parole and the normal rehearing schedule is appropriate. The Commission finds at this time there is a reasonable probability that you would not obey the law if released, and that your release would endanger the public. Specifically, you are a more serious parole risk than the guideline and rehearing range based on your continued serious negative institutional behavior. Specifically, since your initial parole hearing in May of 2008, you have incurred an incident report for possessing a dangerous weapon and another for possessing intoxicants. Prior to your initial hearing, you had incurred incident reports for refusing to take an alcohol test on 9/18/2006, fighting with another inmate on 9/18/2006, Assault with Serious Injury on 4/18/2003, and Possessing Intoxicants on 7/16/2002. You have continued a pattern of possessing/using intoxicants and your possession of a weapon indicates a willingness to engage in the type of assaultive conduct that you have previously demonstrated. The seriousness, frequency and recent nature of your misconduct indicate to the Commission that you still pose a significant risk to the community if released on the parole at this time. Thus, the Commission is departing from the guidelines and is expecting that you will establish a significant period of time where you demonstrate violation free conduct and continue programming, which may help reduce the risk that you currently present to the community. The guidelines for the time to rehearing indicate that your next hearing should be scheduled within 12 months. A departure from these guidelines is found warranted for the same reasons as stated above to deny your parole." (Dkt.# 13-6 at 1).

fighting with another inmate, possessing intoxicants and twice being absent from assignment. It cannot be said that the Commission's conclusion that the "seriousness, frequency and recent nature" of his misconduct indicated that he still posed a significant risk to the community if released on the parole at that time was erroneous.

Likewise, petitioner's Ground Three claim that at his 2009 hearing, the Commission used institutional infractions that fell outside the window of the DCMR Parole Guidelines in order to deny him parole must also fail. Here, petitioner appears to be referring to action taken by the Parole Board in 1991 which "adopted a policy guideline ("1991 Policy Guideline) to define terms used in the appendices" to the 1987 Regulations. Sellmon v. Reilly, 551 F.Supp.2d 66 (D.D.C. 2008). The 1991 Policy Guideline defined "negative institutional behavior" to **exclude consideration of an infraction** (other than murder, manslaughter, kidnaping, armed robbery, or first degree burglary) **occurring more than three years before the initial parole hearing**. Id. (emphasis added). However, a review of the record indicates that the Board did not consider any offenses outside the three-year window prior to the December 22, 2009 hearing. After listing all of the petitioner's institutional infractions both before the May 2008 hearing and after, the hearing examiner specifically said

> [s]ince this is a new Initial Hearing, there are really only two "countable" infractions that have occurred within the three years prior to this hearing. These are both Class I offenses (Possessing a Dangerous Weapon and Possessing Intoxicants), which would qualify the subject for the plus 1 point for negative institutional behavior. The other violations are listed to show the seriousness and frequencies of the subject's other violations.

(Dkt.# 13-7 at 3-4).

Accordingly, this claim has no support in the record and must be dismissed.

15

Because the Constitution itself does not create any liberty interest in parole, such an interest must emanate from state law, or in this case, District of Columbia law. See Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7 (1979). Courts have consistently held that the D.C. parole statute, which applies to D.C. Code offenders even after they were transferred to the jurisdiction of the USPC, does not create any liberty interest in parole. See, *e.g.*, McRae v. Hyman, 667 A.2d 1356 (D.C. 1995) (The District's parole scheme confers discretion to grant or deny parole and the scoring system creates no liberty interest overriding the exercise of that discretion); Ellis v. District of Columbia, 84 F.3d 1413 (D.C. Cir. 1996) (D.C. parole statute and regulations do not create any liberty interest in parole.) Furthermore, Congress committed decisions to grant or deny parole to the absolute, unreviewable discretion of the USPC. Garcia v. Neagle, 660 F.2d 983, 988 (4th Cir. 1981). Parole decisions are therefore not subject to arbitrary and capricious or abuse of discretion review under the provisions of the Administrative Procedures Act, 5 U.S.C. § 701(a)(2). Rather, judicial review is limited to a consideration of whether the Commission "exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations. Garcia at 988; see also Fardella v. Garrison, 698 F.2d 208, 210 (4th Cir. 1982).

Accordingly, because the USPC's exercise of its discretion in denying the petitioner parole is unreviewable, this Court is "without power to engage in judicial review of the Commission's substantive decision" to deny him parole, Garcia at 988. In other words, the substance or merits of the parole decision concerning the petitioner are beyond judicial review.

**Ground Four: <u>Whether the Commission's Exercise of Petitioner's Risk Evaluation Violated the Ex Post Facto Clause.</u>**

Petitioner argues that the Commission's "exercise of risk evaluation under the 2000 [sic] the 1987 [sic] DC Parole Guidelines violates the Ex Post Facto clause." Although at first read, it appears that petitioner is complaining that the use of the 2000 guidelines at his initial May 2008 hearing violated his due process,[13] a further read appears to indicate that petitioner's complaint is that it is the December 22, 2009 Reconsideration hearing that "is the Procedural [sic] due process again stated, with the new hearing that procedural errors now violate [sic]." (Dkt.# 1-1 at 4).

The *ex post facto* Clause "forbids the Congress and the States to enact any law which imposes a punishment for an act which was not punishable at the time committed; or imposes additional punishment to that then prescribed." Weaver v. Graham, 450 U.S. 24, 28 (1981) (internal quotations omitted). The central concerns of this provision are "the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." Id. at 30. "To fall within the *ex post facto* prohibition, a law must be retrospective – that is, it must apply to events occurring before its enactment – and it must disadvantage the offender affected by it, by altering the definition of criminal conduct or increasing the punishment for the crime." Lynce v. Mathis, 519 U.S. 433, 441 (1997).

In this particular case, it is clear that the crimes for which the petitioner is incarcerated were committed after the adoption of the 1987 but before the 2000 Regulations. The record reflects that the USPC utilized the 2000 Regulations at his initial hearing and the 1987 Regulations at his subsequent post-Sellmon hearing. The petitioner claims that the retroactive

---

[13] Petitioner contends that at his Initial Hearing on May 7, 2008, the Commission "applied the 2000 guidelines to wit [sic] resulted in a denial of parole." (Dkt.# 1-1 at 1).

application of these guidelines to his 1996 conviction creates an *ex post facto* violation. The undersigned finds his argument to be without merit.

At the time the petitioner committed the offense for which he is still under sentence, parole eligibility was determined by a statute in effect since 1932, which provides in pertinent part that:

> in imposing sentence on a person convicted in the District of Columbia of a felony, the justice, the justice or judge of the court imposing such sentence shall sentence the person for a maximum period not exceeding the maximum fixed by law, and for a minimum period not exceeding one-third of the maximum sentence imposed, and any person so convicted and sentenced may be released on parole as herein provided at any time after having served the minimum sentence.

D.C. Code § 24-403(a) (2001).

The parole authority operated pursuant to a statute, also in effect since 1932, which provides that:

> [w]henever it shall appear to the Board of Parole that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law and remain at liberty without violating the law, that his release is not incompatible with the welfare of society, and that he has served the minimum sentence imposed or the prescribed portion of his sentence, as the case may be, the Board may authorize his release on parole upon such terms and conditions as the Board shall from time to time prescribe.

D.C. Code § 24-4-4(a).

To the extent that petitioner is alleging that the Commission's consideration of his risk to the community using the 2000 guidelines instead of the 1987 guidelines at his Initial Hearing in May 2008 was an *ex post facto* clause violation, petitioner's claim fails. Petitioner's Total Guideline Range at his May 2008 hearing was 214-238. At the date of his May 2008 hearing, he had only served twelve years, one month and 18 days, considerably less than the period of time

equal to the bottom of his total guideline range of 214 months, or 17.83 years. The Commission properly concluded he was "unsuitable for parole." 28 C.F.R. §§ 2.80(h), (I), & (f).

Even if the 1987 regulations had been used at his initial hearing, he would not have been eligible for parole until he had served his minimum sentence. His combined minimum sentence for the four crimes was thirteen years and four months; he was still short of having served his minimum sentence.

To the extent that petitioner is alleging that, pursuant to the Sellmon decision, the nineteen months[14] he served between the May 2008 and December 2009 parole hearings should have been credited toward the 24-month set-off he received at the December 22, 2009, petitioner's claim is still without merit. Petitioner did not have a parole-eligible scores at his first hearing; thus he was not entitled to any credit of nineteen months toward an earlier reconsideration hearing.

Accordingly, it is clear that under either statute, the Parole Board had discretion whether to parole a particular individual, and there was no guarantee that parole would be granted at the earliest possible date, or any date thereafter. Therefore, the petitioner cannot show that either the use of the 2000 guidelines at his May 2008 hearing or the 1987 guidelines as his December 2009 hearing substantially raised an increase in his punishment as compared to the regime used by the Board of Parole at the time he was convicted. Furthermore, it must be remembered that the petitioner was sentenced to a term of forty years. Therefore, any period of incarceration exceeding the combined minimum sentence of thirteen years and four months is not an increase in sentence, because the petitioner ultimately faces a forty-year sentence. Therefore, in petitioner's case, in particular, the change in parole guidelines could not violate the *ex post facto*

---

14

clause, as there can be no increase in punishment beyond the possible forty-year sentence that was imposed.

## IV. RECOMMENDATION

Based on the foregoing, the undersigned recommends that the respondent's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Dkt.#12) be **GRANTED,** and petitioner's §2241 petition be **DENIED** and **DISMISSED WITH PREJUDICE.**

Any party may file, **within fourteen (14) days** after being served with a copy of this Recommendation, with the Clerk of the Court, written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to his last known address as shown on the docket. The Clerk is further directed to provide copies of this Report and Recommendation to counsel of record via electronic means.

DATED: January 30, 2012

                                           /s/ James E. Seibert
                                          JAMES E. SEIBERT
                                          UNITED STATES MAGISTRATE JUDGE